## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

R.J. ZAVORAL & SONS, INC.; JOHN T.
ZAVORAL; PETER M. ZAVORAL; and
CRAIG A. PIETRUSZEWSKI,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civ. No. 12-668 (MJD/JJK)

_____

      David W. Fuller and Pamela Marentette, Assistant United States Attorneys, Counsel for Plaintiff.

      Ted Roberts and Kyle E. Hart, Fabyanske, Westra, Hart & Thomson, P.A., Counsel for Defendants.

_____

## I.      Introduction

      This matter is before the Court on Defendants R.J. Zavoral & Sons, John T.

Zavoral, Peter M. Zavoral and Craig A. Pietruszewski's motion for summary

judgment [Doc. No. 111] and Plaintiff United States of America's motion for

partial summary judgment.  [Doc. No. 114]

1

II.     **Background**

The United States Army Corps of Engineers ("Corps") set aside the

contract for work on the Heartsville Coulee Diversion, which was part of the East

Grand Forks Flood Damage Reduction Project ("the Heartsville Project") for a

qualified company under Section 8(a) of the Small Business Act, 15 U.S.C. §

637(a)(1)(B).  (Fuller Decl. Ex. 3 (John Zavoral Dep. at 6, 8-9).)  The scope of this

project was to "provide all plant, labor, materials and supplies necessary for

construction of approximately 17,560 linear feet of earth levees, 6,170 linear feet

of diversion channel, a new highway bridge over the diversion . . . " (Henricks

Decl. Ex. A at ZAVORAL_0006198.)

The Section 8(a) program is administered by the Small Business

Administration ("SBA") and is intended to promote the business development of

companies owned and operated by "socially and economically disadvantaged

individuals," including women and members of minority groups.  15 U.S.C. §

631(f)(2)(A).  Ed's Construction is qualified as a small business concern under the

8(a) program. (Roberts Decl. Ex. 1.)

Defendant R.J. Zavoral & Sons, Inc. ("RJZ") is a Minnesota corporation that

is involved in the construction business.  Defendants Peter and John Zavoral are

officers of RJZ.  In 2004, RJZ formed a joint venture with Ed's Construction ("the Joint Venture") for the purpose of bidding on the construction contract for the Heartsville Project ("the Contract").

Federal regulations permit joint ventures between qualified 8(a) participants and non-8(a) participants for the purpose of obtaining work set aside for 8(a) participants, so long as a number of conditions are met.  Such agreements are permitted only where the participant lacks the capacity to perform the contract on its own.  13 C.F.R. § 124.513(a)(2).  Joint venture agreements must be approved by the SBA. 13 C.F.R. § 124.513(e).  To approve the agreement, the SBA must conclude that the agreement is "fair and equitable and will be of substantial benefit to the 8(a) concern." 13 C.F.R. § 124.513(a)(2).  In addition, each joint venture agreement must contain a number of provisions.  See 13 C.F.R. § 124.513(c).  For example, a joint venture agreement must contain a provision that the 8(a) participant owns at least 51% of the joint venture entity, is designated the managing venturer, and earns profits commensurate with its ownership interest in the joint venture.  13 C.F.R. § 124.513 (c)(2), (3) and (4).

The Joint Venture Agreement ("JVA") at issue in this case was signed on April 1, 2004 by Defendants John and Peter Zavoral and by Edward Morgan,

president of Ed's Construction.  (Fuller Decl. Ex. 2.)  The JVA includes terms

which complied with the 8(a) joint venture requirements discussed above:  Ed's

Construction was to "provide labor, materials, and equipment necessary to

complete a minimum of fifty-one percent (51%), or $2 million of the work to be

completed, whichever is less," (id. § 3) was to be the "managing party" on the

project, (id. § 4 (b)) and was entitled to "fifty-one percent (51%) of the net before

tax profits derived from the Joint Venture."  (Id. § 7.)  The JVA also required the

parties to submit quarterly financial statements to the SBA in accordance with 13

C.F.R. § 124.513(c)(10).  (Id. § 10.)

The JVA further provided that John Zavoral would be the representative

for RJZ and Ed Morgan would be the representative for Ed's Construction.

(Fuller Decl. Ex 2 § 4.)  Ed Morgan was designated as the project manager,

responsible for the general supervision and management of the project.  (Id. § 6.)

Ed's Construction was also responsible for providing $51,000 in working capital,

and RJZ was to provide $49,000, to be deposited in a bank account in the name of

R.J. Zavoral - Ed's Construction Joint Venture.  (Id. § 8.)  All withdrawals from

this account required the signature of Ed Morgan and a representative of RJZ.

(Id.)

When the Corps sought bids for work on the Heartsville Project, the request for bids specifically provided that "[o]nly those firms recognized as 8(a) by the [SBA] will be el[i]gible to bid." (Henricks Decl. ¶ 5, Ex. A.)  The request for bids also specified that "the SBA . . . is the prime contractor and retains responsibility for 8(a) eligibility determinations and related issues, and for providing counseling and assistance to the 8(a) Contractor under the 8(a) Program." (Id. ¶ 7, Ex. A.)  Finally, the request for bids provided: "The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation."

The Joint Venture submitted a bid for the Heartsville Project, and in response, the Corps sought a Determination of Eligibility from the SBA to determine whether the SBA had approved the Joint Venture.  (Czaia Decl. Ex. G.)  Randy Czaia was the supervisory business opportunity specialist for the SBA, and in that role, he analyzed and evaluated the proposed joint venture agreement between RJZ and Ed's Construction.  (Czaia Decl. ¶¶ 1, 12.)  As part of his analysis, Czaia took steps to ensure that the parties understood the importance of compliance with Section 8(a) requirements.  (Id. ¶ 18.)  He spoke by phone with John Zavoral on at least one occasion, and during that conversation, Zavoral

expressly assured him that he understood the terms of the JVA and that he

would adhere to its terms.  (<u>Id.</u> ¶¶ 20-22, 25; Fuller Decl. Ex. 8 (Czaia Dep. at 295-

96).)  Czaia would not have approved the Joint Venture had he not believed that

both RJZ and Ed's Construction understood the requirements of Section 8(a) and

the terms of the JVA and that they were committed to following those terms.

(Czaia Decl. ¶ 28.)  Ultimately, Czaia recommended to his supervisor Ed Daum

that the proposed joint venture be approved.  (<u>Id.</u> ¶ 13.)  Daum followed the

recommendation and approved the JVA.  (<u>Id.</u>)

Approval of the Joint Venture under Section 8(a) was granted in July 2004.

(<u>Id.</u> Ex. F.)  Thereafter, the Contract was awarded to the Joint Venture in August

2004.  (Fuller Decl. Ex. 1; Henricks Decl. Ex. A at ZAVORAL_0006199.)

The contracting officer for the Corps on the Heartsville Project was James

Roloff.  (Henricks Decl. ¶ 3.)  In that position, Roloff had authority over routine

and nonroutine issues involving the administration of the contract.  Roloff

designated a representative, Virginia Regorrah, to perform a number of functions

with respect to administration of the Contract, such as verify, through

inspections, that the contractors were performing the technical requirements of

the Contract, maintain liaison and direct communications with the contractors,

6

and to monitor and report deficiencies observed during surveillance.  (Id. Ex. B.)
From early 2005 through 2008, Kevin Henricks replaced Roloff as he contracting
officer for the Heartsville Project.  (Henricks Decl. ¶ 2.)

Work on the Heartsville Project began in August 2004, and initially, Ed's
Construction's participation in the work was very strong.  (Roberts Decl. Ex. 18
(Regorrah Dep. at 86).)  However, around November 2004, Virginia Regorrah
noticed that Ed's Construction's participation began to taper off.  (Id. at 87.)

By the end of 2004, Ed's Construction had done only $354,994 of the work.
(Id. Ex. 28.)  In February 2005, Defendant Craig Pietruszewski emailed Joe
Zavoral, stating that "we need to do some rental billings with Ed's Construction
Services to help fulfill the JV obligations."  (Id. Ex. 29.)  In another email,
Pietruszewski sent Dan and John Zavoral a revised equipment schedule for the
month of January 2005, which indicated equipment usage and rental by Ed's
Construction of various equipment totaling $613,941. (Id. Ex. 30.)  In the email,
Pietruszewski wrote that he had "some thoughts regarding the meeting with Ed
and Lethia this Thursday, trying to help explain all of this to them."  (Id.)

In a meeting in mid-February with the Zavorals, the Morgans and
Pietruszewski, the Morgans agreed to the above-referenced leasing arrangement

that allowed Ed's Construction to take credit for work performed by others.  (Id.

Ex. 14 (Ed Morgan Dep. at 97-98; Ex. 17 (Lethia Morgan Dep. at 24-25); Ex. 31

(Pietruszewski To Do List as of January 2005 "Go Over Equipment Rental Back

Billing to Ed with John and Ed").)  Lethia Morgan felt pressured at this meeting

to agree to the leasing arrangement.  (Id. Ex. 17 (Lethia Morgan Dep. at 90-91)

("Well, there was two of us and there was them and they were all just kind of

leaning in and their tone of voice and their sense of urgency about it.  And also, I

think that they knew how worried we were about filling the amount of work we

were supposed to do and that we couldn't keep up our payments over winter.

And I think they just preyed on that.").)

    In July 2006, Ed and Lethia Morgan complained to Virginia Regorrah, the

contracting officer's representative, that they had not gotten the work on the

project that they expected.  (Roberts Decl. Ex. 18 (Regorrah Dep. at 45-46).)

Regorrah told them to contact the contracting officer on the project, Jim Roloff.

(Id. at 46.)  Regorrah did call Roloff about the Morgan's concerns, and told him

the Morgans would be contacting him.  (Id. at 47.)  The Morgans also complained

to Randy Czaia about being promised work that was then given to another

contractor.  (Id. Ex. 10 (Czaia Dep. at 314-15).)

### III.   Defendants' Alleged Fraud

The Government contends that RJZ entered into the JVA with no intention of complying with its terms.  The Government further contends that throughout the performance of the Contract, Defendants engaged in a number of schemes to create the appearance of compliance with the Section 8(a) requirements set forth in the JVA, including the submission of false statements and records to the SBA.

As detailed below, the Government asserts these requirements and others were not met.

### A.   Fraudulent Inducement

John Zavoral signed the JVA on behalf of RJZ.  At the time he signed the JVA, he understood that RJZ could not have bid on the Heartsville Project without entering into the Joint Venture with Ed's Construction, as RJZ was not a Section 8(a) company.  (Fuller Decl. Ex. 3 (J. Zavoral Dep. at 6, 12.)  He further understood that after the Joint Venture was awarded the contract on the Heartsville Project, the Joint Venture had to comply with Section 8(a) and the JVA.  (Id. at 6.)  Despite this understanding, Zavoral admitted that his understanding of the requirements of Section 8(a) and the JVA was limited to Ed's Construction making $2 million under the contract.  (Id. at 8.)  He further

admitted that he does not recall if he read the JVA before signing it, and he did not consider RJZ's ability to comply with Section 8(a), as he did not understand the Section 8(a) program.  (Id. at 10-12.)

The Government asserts that Zavoral's representations that he understood the terms of the JVA and that he would adhere to its terms were false.  Zavoral testified that he signed the JVA without reading it, did not consider RJZ's ability to comply with the terms set forth in the JVA and that he was unaware of anyone at RJZ who was familiar with the terms of the JVA.  (Fuller Decl. Ex. 3 (J. Zavoral Dep. at 10-11).)  He further testified that he did not understand the Section 8(a) program.  (Id. at 12.)  When asked about specific terms in the JVA, such as the requirement that the parties to the Joint Venture use their own labor force, John Zavoral testified that he did not understand the term.  (Id. at 26, 27-28.)  It is the Government's position that based on this evidence, Defendants never intended to comply with the terms of the JVA, including the requirements of Section 8(a) as incorporated in the JVA.

### B.   Profit Sharing

The Government has retained an expert who has opined that RJZ obtained a net profit of $4,729,039, while Ed's Construction lost money on the project.

(Fuller Decl. Ex. 13 (Expert Report of Thomas Hagen at 6, 9).)  Defendants have

also retained an expert who has opined that RJZ obtained a net profit of

$2,649,578 while Ed's Constructed made a profit of $499,813.  (Fuller Decl. Ex. 12

(Expert Report of William Guernier at 1, 15).)  Even when relying on Defendants'

expert's calculations, it is clear that Ed's Construction did not earn 51% of the

profits as set forth in the JVA.  (Id.)

The Government asserts that Defendants took steps to keep Ed's

Construction in the dark concerning profits earned by the parties in the JV.  For

example, near the beginning of the project, Ed Morgan expressed to John Zavoral

his expectation that an audit would be completed at the end of the project.  (Id.

Ex. 14 (Ed Morgan Dep. at 41).)  Zavoral become clearly upset by this statement,

declaring that no such audit would take place.  (Id. at 224).

C.     Signature Requirement

The Government asserts that John Zavoral recommended his longtime

friend, Pietruszewski, to serve as the accountant for the Joint Venture.  The JVA

provided that the Joint Venture open a bank account, and that all withdrawals

from such account have Ed Morgan's signature. (Id. Ex. 2 (JVA at ¶ 8).)  By letter

dated September 27, 2004, Ed Morgan and John Zavoral named Pietruszewski as

11

an additional signatory to this account.  (Id. Ex. 15 at 4.)  The letter also provided

that all checks issued by the Joint Venture required only two of the four

authorized signatories, after the addition of Pietruszewski, eliminating the

requirement that Ed Morgan sign such checks.  (Id.)

Thereafter, in January 2005, Defendants issued a check to "WayCool 3d"

from the Joint Venture account in the amount of $55,000, signed by John Zavoral

and Craig Pietruszewski.  (Id. Ex. 16.)  The Morgans were unaware that WayCool

3d had performed work on the Heartsville Project.  (Id. Ex. 21 (Amended RFA

Responses 87-92); Ex. 14 (Ed Morgan Dep. at 179 (testifying that he was unaware

the WayCool 3d had performed work on the Heartsville Project); Ex. 17 (Lethia

Morgan Dep. at 144).)  WayCool 3d purportedly performed work on the project,

but never signed a subcontract for such work, and Pietruszewski generated an

invoice without supporting paperwork, such as receipts and payroll records.  (Id.

Ex. 3 (John Zavoral Dep. at 169-70); Ex. 4 (Pietruszewski Dep. at 182-87).)

In October 2006, the Morgans became suspicious after they saw a number

of Joint Venture checks that had been signed by only John Zavoral and

Pietruszewski.  (Id. Ex. 17 (Lethia Morgan Dep. at 22).)  They sent Pietruszewski

an email stating that as of October 2, 2006, all Joint Venture checks had to have

Ed Morgan's signature on them.  (<u>Id.</u> Ex. 18.)  Pietruszewski responded to the mail, stating "no problem."  (<u>Id.</u>)

On February 8, 2008, an attorney representing Ed's Construction wrote to RJZ, stating that the Joint Venture would be hiring a forensic accountant and that pending completion of the audit, Ed's Construction was not willing to allow any disbursements from the Joint Venture account.  (<u>Id.</u> Ex. 19.)  On that same day, John Zavoral and Pietruszewski signed a check from the Joint Venture account, made out to RJZ in the amount of $477,702.63.  (<u>Id.</u> Ex. 20.)  The check was written to cover an invoice that reflected all work performed by RJZ from October 2006 through the date of the check.  (<u>Id.</u> Ex. 22.)

    **4.**    **Work Requirement**

The Government asserts that Defendants submitted false statements and records prepared by Pietruszewski in order to give the SBA the impression that Ed's Construction was continuing to participate in the project, and that the Joint Venture was complying with 8(a) requirements.

For example, the Morgans were credited in January 2005 for work in which Ed's Construction leased equipment from RJZ.  The daily construction quality control management reports submitted by the Joint Venture do not support the

work attributed to Ed's Construction through the leasing agreement for January 2005.  Instead, they show Ed Morgan supervising his own crew in a specified area - not supervising or coordinating RJZ employees in another area.  (Id. Ex. 35.)  The leasing agreement is also inconsistent with an email sent to Randy Czaia at the SBA on February 3, 2005 from Lethia Morgan in which she stated that Ed's Construction had only billed the Joint Venture $240,000 since October for machine and wages, and in which she expressed concern that as Ed's Construction had to do $2 million worth of work, she wanted to meet with the Zavorals to figure out where they were and what they needed to be doing.  (Id. Ex. 36.)

The Government further asserts that near the end of the project, the Joint Venture submitted a report to Randy Czaia at the SBA which included the inception to date financials for the Heartsville project.  (Id. Ex. 23.)  This report indicates that Ed's Construction performed $2,524,340 of the work.  (Id.)  Of this amount, the Government asserts that $200,000 was a profit distribution; $646,280 was from the sham leasing agreement, and $869,220.54 was for work associated with hauling and placing rip-rap, much of which Ed's Construction did not do and should not get credit for.

14

With respect to the work associated with rip-rap, the Government asserts that ICS billed Ed's Construction for $296,180 for work hauling R80 and R270 sized rip-rap.  (Id. Ex. 37.)  Ed's Construction then billed the Joint Venture for rip-rap work totaling $296,180, added a 2% handling fee, and then received credit for the work performed by ICS.  (Id. Exs. 28 (Statement of Operations for the Contract Period ended March 31, 2005), 38 (Invoice from Ed's Construction), 39 (Joint Venture Bank Statement).)  The Government asserts that project records demonstrate that Ed's Construction could not have done the rip-rap work, as it was not performing work on the job at that time.  (Id. Ex. 40 (March 1, 2005 weekly meeting record showing R270 and R80 rip-rap placed during previous week and throughout month of March 2005 by Clay Products), 41 (Payroll records of Ed's Construction showing no work performed from March 9, 2005 through June 30, 2005).)

5.     **Reporting Requirements**

Pursuant to the JVA, the Joint Venture was to prepare quarterly financial statements showing the cumulative contract receipts and expenditures.  (Id. Ex. 2 § 10.)  The Government asserts that although these reports were sent, most included false and misleading information, as demonstrated by the fact that the

15

numbers forming a basis for the reports reflected credit to Ed's Construction for the profit distribution, sham leasing agreement and rip-rap items, which inflated the amount of work Ed's Construction performed.

The Joint Venture was also to provide a project-end profit and loss statement to the SBA no later than 90 days after completion of the project. The Government asserts it is undisputed that such a statement was not submitted, and that Defendants actually went out of their way to obfuscate matters. Randy Czaia told RJZ that cost information should be included in this statement, yet the report ultimately prepared did not contain such information, nor did it report profits.

### 6.    Role of Ed's Construction

Finally, the Government asserts that it is undisputed that Ed's Construction - although named the managing party of the Joint Venture and that Ed's Construction would participate in all decisions, commitments, agreements, undertakings, understandings and other matters - did not have the degree of control and participation in the project as required. (Fuller Decl. Ex. 21 (Amended Responses to RFA 28-33).)

**7.      False Certifications**

The Joint Venture submitted 22 requests for payment to the Corps for work on the Heartsville Project, each time certifying that the "amounts requested [were] only for performance in accordance with the specifications, terms, and conditions of the contract."  (Id. Ex. 9.)  One such request was signed by Pietruszewski, while the others were signed by John Zavoral.  (Id.)  The Government alleges that each request for payment was a false certification, as payment was conditioned on the Joint Venture performing in accordance with the specifications, terms, and conditions of the Contract, which conditions included the Section 8(a) requirements set forth in the JVA.

The Government brought this action alleging that Defendants engaged in fraud in order to secure the Contract and to maintain the Joint Venture's performance of the Contract even when those terms of the JVA incorporating the requirements set forth in SBA regulations were not being met.  The Amended Complaint sets forth six counts:  Count I, False or Fraudulent Claims under the False Claims Act ("FCA") 31 U.S.C. § 3729(a)(1); Count II, False Statements under the FCA, 31 U.S.C. § 3729(a)(1)(B); Count III, Violations of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") 12 U.S.C.

§§ 1833a(a), (c)(3) ; Count IV, Unjust Enrichment; Count V, Payment by Mistake against RJZ; and Count VI, Breach of Contract against RJZ.

Before the Court is Defendants' motion for summary judgment as to all claims and the Government's motion for partial summary judgment.  By its motion, the Government seeks a finding of liability on all counts as to RJZ, and an order overruling all of the Defendants' affirmative defenses.  The Government does not seek summary judgment as to damages, and does not move for summary judgment against the individual defendants.

## IV.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## V.     False Claims Act - Counts I and II -  False or Fraudulent Claims

In Count I, the Government asserts Defendants knowingly presented, or

caused to be presented, to an officer or employee of the United States

Government, false or fraudulent claims for payment or approval, specifically the

invoices submitted by Defendants to the Corps, in violation of 31 U.S.C.

3729(a)(1)(2009).  In Count II, the Government claims that Defendants knowingly

made, used, or caused to be made or used, a false record or statement material to

a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B) (2008),[1]

including false claims and certifications submitted to the Corps for payment or to

the Corps and/or SBA in connection with claims for payment.

### A.     Statute of Limitations

Defendants argue that the Government's claims under the FCA are time-

barred.  Pursuant to 31 U.S.C. § 3731(b), an action pursuant to the FCA must be

brought: 1) six years from the date that a violation occurs, or 2) three years from

the date that the facts material to the fraud are known or should have been know

---

[1]Defendants had previously argued that the FERA version of 31 U.S.C. § 3721(a)(1)(B), enacted in 2009 but retroactive to June 8, 2008, did not apply in this case.  The Court declined to resolve this issue, finding the Government had pled facts sufficient to make out a claim under either the pre-FERA or FERA version.

by the official of the United States charged with responsibility to act in the

circumstances, which ever occurs last.  Defendants assert that the applications for

payment under the Contract were submitted between August 30, 2004 and

January 18, 2008.  This action was filed on March 15, 2012, therefore any

applications for payment made prior to March 15, 2006 are time-barred.

Defendants further argue that the tolling provision does not apply here,

because the government official charged with the responsibility to act, knew or

reasonably should have known as early as 2006 and no later than 2008, of

Defendants' allegedly false statements and certifications.  Randy Czaia, the SBA's

Section 8(a) business development specialist, testified at his deposition that as of

February 17, 2006, he did not believe that Ed's Construction was participating in

the management of the project, as provided for in the JVA, and that Defendants'

promises with regard to the management of the project were insincere.  (Hart

Decl, Ex. 3 (Czaia Dep. at 183).)  Czaia also testified that as February 2006, he was

aware that RJZ had hired subcontractors over Ed's Construction's objections, and

that Defendants were not communicating with Ed's Construction.  (<u>Id.</u> at 185-86.)

Also, by letter dated May 21, 2008 to Czaia, Ed's Construction filed a formal

complaint against RJZ.  (<u>Id.</u> Ex. 24.)

The limitations period under § 3731 (b)(2) begins to run when an official who has authority to initiate litigation under the FCA obtains knowledge of the fraud - not just any government official.  See Jana, Inc. v. United States, 34 Fed. Cl. 447, 451 n.6 (1995) (recognizing that the only government official with responsibility to act in the circumstances would be the official at the Civil Division of the Department of Justice ("DOJ") which has the exclusive authority to bring litigation under the FCA); United States v. Macomb Contracting Corp., 763 F. Supp. 272, 274 (1990) (same).  The same is true for the six year limitation period for common law claims.  28 U.S.C. § 2416(c); United States ex rel. Costa v. Baker & Taylor, Inc., No. C-95-1825, 1998 WL 230979 at *13-14 (N D. Cal. Mar. 20, 1998) (citing United States ex. rel. O'Keefe v. McDonnell Douglas Corp., 918 F. Supp. 1338, 1345 (E.D. Mo. 1996)).  As applied in this case, Randy Czaia is not the official with the authority to initiate litigation.  Rather, such authority rests with the DOJ.  See 31 U.S.C. § 3730(a).

The record demonstrates that the DOJ became involved in this matter on June 13, 2008.  (McGurran-Hanson Decl. Ex. 3 (Privilege Log showing earliest involvement of DOJ was on June 13, 2008).)  The FCA provides that the United States has three years to file suit from the date the DOJ official knew or

reasonably should have known of the material facts giving rise to the FCA claims

asserted.  In addition, RJZ signed multiple tolling agreements beginning in 2010,

which tolled the limitations period between November 23, 2010 and February 1,

2012, which in effect added 435 to the limitations period.  (See Hart Decl. Ex. 19.)

Accordingly, any action commenced within 1,530 days of June 13, 2008 - which is

August 12, 2012 - would be timely.  As this action was filed on March 15, 2012, it

is not time-barred.

### B.    Fraudulent Inducement

Under the FCA, liability will attach to any "claim submitted to the

government under a contract so long as the original contract was obtained

through false statement or fraudulent conduct."  In re Baycol Prod. Litig., 732

F.3d 869, 876 (8th Cir. 2013).  Under this theory "claims for payment

subsequently submitted under a contract initially induced by fraud do not have

to be false or fraudulent in and of themselves in order to state a cause of action

under the FCA."  Id.; see also United States ex rel. Hendow v. Univ. of Phoenix,

461 F.3d 1166 (9th Cir. 2006) (finding that liability will attach to each claim

submitted to the government under a contract, when the contract or extension of

a government benefit was originally obtained through false statements or

fraudulent conduct).

The Government argues that RJZ, through John Zavoral, made a number of false representations to Randy Czaia, prior to Czaia recommending that the JVA be approved.  For example, Czaia asserts that he worked with RJZ and Ed's Construction to ensure that the JVA complied with applicable Section 8(a) requirements, and that if the JVA did not comply with such requirements, he would not have recommended that the JVA be approved. (Czaia Decl. ¶ 15-16, Ex. E; Fuller Decl. Ex. 6, Ex. 7 (Czaia Dep. at 8).)  During one telephone conversation Czaia had with John Zavoral, Zavoral expressly assured him that he understood the terms of the  JVA and that he would adhere to its terms.  (Czaia Decl. ¶¶ 20, 21.)  At a meeting on August 25, 2004 with RJZ and Ed's Construction, Czaia again sought to make sure that the parties understood the requirements set forth in the JVA, to which John Zavoral again assured him that RJZ was committed to complying with the JVA and that he "would take good care of Ed."  (Id. ¶¶ 23-25.)

It is the Government's position that Zavoral's representations were false because RJZ never intended to comply with the terms of the JVA, and in particular the Section 8 (a) requirements incorporated therein.  Zavoral testified

that he signed the JVA without reading it, did not consider RJZ's ability to comply with the terms set forth in the JVA and that he was unaware of anyone at RJZ who was familiar with the terms of the JVA.  (Fuller Decl. Ex. 3 (John Zavoral Dep. at 10-11).)  He further testified that he did not understand the Section 8(a) program.  (Id. at 12.)  When asked about specific terms in the JVA, such as the requirement that the parties to the Joint Venture use their own labor force, John Zavoral testified that he did not understand the term.  (Id. at 26, 27-28.)  Had he known Zavoral had not read the JVA prior to signing it, and was unaware of its terms, Czaia would not have approved the JVA to bid on the Heartsville Project. (Czaia Decl. ¶ 28.)

Because RJZ could not have participated in the Contract without entering into a Joint Venture with an SBA approved Section 8(a) business, and that the SBA had to approve of the Joint Venture, the Government asserts that any false statements made in order to procure the Contract would be material to any payment made thereunder.  United States ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818, 825 (8th Cir. 2009); accord 31 U.S.C. § 3729(b)(4) ("the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").

24

Defendants argue that the Government's evidence of assurances by John Zavoral are too vague to support a claim of fraudulent inducement because to satisfy the first element of an FCA claim, a false statement or fraudulent course of conduct requires proof of an objective falsehood.  United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (finding that mere allegations of poor and inefficient management of contractual duties is not actionable under the FCA).  This argument misconstrues the Government's claim, however.  The fraudulent inducement claim alleges more than mere inefficient management of a contract.  Instead, the Government's claim is that the JVA contained specific requirements and that John Zavoral falsely represented that RJZ would comply with these specific responses.

Defendants next argue that the Government has not presented any evidence that by providing assurances to Czaia, John Zavoral intended to fraudulently induce the Government to approve the JVA, in order for Defendants to work on the Heartsville project.

This argument has no merit because the FCA defines "knowingly" to "mean that a person, with respect to information . . . has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information;

or acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. §

3729(b)(1)(A)(iii).  There is no specific intent requirement.  § 3729 (b)(1)(B).

Accordingly, the Government can succeed on this claim if it proves that Zavoral's

assurances to comply with all terms in the JVA were in reckless disregard of the

truth or falsity of the statement.

There is evidence in the record from which a reasonable fact-finder could

conclude that John Zavoral acted in reckless disregard of the truth as evidenced

by his testimony that he did not consider RJZ's ability to comply with the terms

of the JVA, and that he made no attempt to understand said terms.  (Fuller Decl.,

Ex. 3 (J. Zavoral Dep. at 10-11).)  He further admitted that he had no

understanding of the Section 8(a) program.  (Id. at 12.)  Another RJZ executive

testified that he had no knowledge of the steps taken to ensure that RJZ complied

with the terms of the JVA and the Section 8 (a) requirements incorporated

therein.  (McGurran-Hanson Decl. Ex. 2 (Peter Zavoral Dep. at 36-37).)

John Zavoral, however, denies that RJZ entered into the JVA with no

intention of complying with its terms.  (Zavoral Decl. ¶ 2.)  He notes that his

deposition was taken nine years after the JVA was executed and that his

recollections were not strong.  (Id. ¶ 7.)  Defendants further assert there is

26

evidence in the record that RJZ tried to comply with the terms of the JVA. For

example, Ed's Construction was named the managing partner of the Joint

Venture, a bank account was entered into in the name of the Joint Venture, and

that Ed Morgan's signature was required on all checks issued, and a spreadsheet

was prepared in good faith, estimating that Ed's Construction would receive over

$2 million of the work. (Id. ¶ 12.) Defendants assert that Ed's Construction,

rather than RJZ, is responsible for the lack of work performed by Ed's

Construction.

Based on these disputed facts, the Court finds that summary judgment on

the claim of fraudulent inducement is not warranted.

## C. Fraudulent Certification

Liability will also attach under the FCA to one who submits a claim for

payment that is based "on a false representation of compliance with an applicable

federal statue, federal regulation or contractual term." See United States v.

Science Applications Int'l Corp., 626 F.3d 1257, 1266 (D.C. Cir. 2010). "False

certifications can be either express or implied. Courts infer implied certifications

from silence 'where certification was a prerequisite to the government action

sought.'" Id. (citation omitted).

In addition, liability under the FCA requires proof that the false statement was material; that is capable of influencing the payment decision.  United States ex. rel. Vigil v. Nelnet, Inc., 639 F.3d 791, 799 (8th Cir. 2011).  The standard is whether the false statements, if known by the government, "might" cause the government to refuse payment.  See Id.

The Government asserts that RJZ knowingly submitted numerous false claims throughout the Heartsville Project and used numerous false statements, including false certifications, to cause the Government to pay money it should not have paid.  It is the Government's position that each time the Joint Venture requested payment under the Contract, John Zavoral or Craig Pietruszewski certified that the requests were only for performance in accordance with the specific terms and conditions of the Contract.  The Government argues such certifications were false because the Joint Venture's eligibility to remain on the Contract was a condition for receiving payments thereunder.  This is evidenced by the fact that the Section 8(a) requirements were ongoing, such as that Ed's Construction be the managing partner and in control of the Joint Venture bank account, that Ed's Construction earn 51% of the profits, and that the Joint Venture submit quarterly financial statements showing contractual expenses and receipts.

28

The Government further asserts that the record contains evidence which demonstrates that RJZ knew that the Section 8(a) requirements were not being met. Even absent evidence of actual knowledge, RJZ's failure to adhere to such requirements constitutes reckless disregard. Each time Defendants submitted a claim for payment to the Government, they were expressly and impliedly certifying their compliance with the Section 8(a) requirements. The materiality of such conditions is clear from the 8(a) regulations, the terms of the JVA and from the language in the Corps' solicitation and award stating that only 8(a) concerns were eligible to be awarded the contract.

In support of the false certification theory, the Government has provided a number of examples of false statements made during the performance of the Contract with respect to whether the Section 8(a) requirements were being met. One example concerns a letter Czaia sent to Ed Morgan dated February 17, 2006, in which Czaia asked for additional information concerning the employees and equipment Ed's Construction leased from RJZ, such as the nature of the work performed, and the degree of control over the leased employees by Ed's Construction. (Fuller Decl. Ex. 51.) Czaia further asked for verification that the material shown on the Joint Venture's financial statements as being attributable

to Ed's Construction was used by Ed's Construction in the performance of its

work.  (Id.)

The Joint Venture responded by letter dated March 13, 2006, which was

signed by Ed Morgan and John Zavoral.  (Id.)  In this letter are false

representations that the parties had agreed to the lease arrangement before the

work had been completed, when in fact, the alleged lease agreement was

proposed to Ed's Construction after the work was completed.  (Id., Ex. 52; Ex. 14

(Ed Morgan Dep. at 97-98); Ex. 17 (Lethia Morgan Dep. at 24-25, 90-91); Ex. 31.)

The letter further informed Czaia that the quarterly Joint Venture Financial

Statements include expenditures for each participant, including Ed's

Construction, and show amounts representing materials and labor "attributable

to the respective participant and used by them in the performance of their work

for the contract and the Joint Venture."  (Id.)  The Government asserts that if the

reports had been accurate, they would have shown that the terms of the JVA

were not being followed because Ed's Construction was not doing the required

amount of work and was not in charge of the project.  In addition, these reports

inaccurately attributed rip-rap work to Ed's Construction, while the invoices

show the work was actually completed by another subcontractor.  (Id. Exs. 28, 37,

30

38 and 39.)

Defendants argue that the Government's express certification claim fails as the Joint Venture's certifications were literally true.  Each claim for payment included a certification that the work billed for complied with the Contract's specifications, terms and conditions.  (Fuller Decl. Ex. 9.)  The Joint Venture billed the Corps for its performance under the Contract, not the JVA.

Next, Defendants argue the Government's implied certification claim fails because RJZ's alleged breach of the JVA did not render the pay applications false as nothing in the applicable regulations or applications for payment condition payment upon its members' compliance with the terms of the JVA.  Instead, the regulations provide that the Joint Venture need only be certified by the SBA and meet certain criteria at the time of submission of the bid.  (Hendricks Decl., Ex. A at 145 (§ 252.219-7010)); see also 13 C.F.R. § 124.507(b)(4) ("Except to the extent set forth in paragraph (d) of this section, SBA determines whether a Participant is eligible for a specific 8(a) competitive requirement as of the date that the Participant submitted its initial offer which includes price.")  Moreover, Defendants assert that the Government has provided no authority for the position that the Joint Venture lost its Section 8(a) eligibility without any

31

administrative action by the SBA.

The Court has already rejected the argument that a joint venture need only be certified by the SBA and meet certain eligibility criteria at the time of the submission of the bid.  (See Doc. No. 20 at 19 ("This argument requires a strained reading of the contract, which would allow a venture to be 8(a) qualified at bidding but then to immediately disregard the 8(a) requirements as soon as actual work on an 8(a) project commenced.  This reading is dubious, particularly in light of the SBA's 8(a) reporting requirements which persisted through completion of the project.") The Court further notes that the Contract includes numerous provisions emphasizing the fact that such Contract is to be awarded to a Section 8(a) participant, in accordance with Section 8(a) regulations.  (See Henricks Decl. Ex. A (Contract, Clause 252.219-7009, 52.232-4004.)  The signature page of the Contract provides that "[t]he offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation."  (Id. at ZAVORAL_0006199.)  The solicitation specifies the Contract will be awarded only to a "Competitive 8(a) program.  (Id. at ZAVORAL_0006198.)  The Court thus finds that Defendants had a continuing duty to comply with the terms of the JVA, which included the Section 8(a)

requirements, during performance of the Contract.

Defendants further assert that the evidence supporting the claims of false statements are disputed.  For example, with regard to the Government's claims related to the signature requirements on the Joint Venture bank account, Defendants assert the signature requirements were amended after Ed Morgan complained about driving to East Grand Forks to sign checks.  (Zavoral Decl. ¶ 29.)  Zavoral asserts that Morgan asked that Pietruszewski be authorized to sign the checks on Ed's behalf.  (Id.)  Under the terms of the JVA, Ed Morgan had the authority to act on behalf of Ed's Construction.  (Fuller Decl. Ex. 2 (JVA § 4(a).)

Defendants also challenge the Government's claim as to the quarterly financial statements.  Defendants assert the purpose of these statements was to convey the amount of the Joint Venture's cumulative contract receipts and expenditures.  Thus, with respect to the $200,000 payment to Ed's Construction, it was proper to include this sum because it was an expenditure of the Joint Venture.

With respect to the alleged "sham" lease agreement, Defendants assert that the facts underlying this claim are contested.  Ed Morgan was present at the work site in January 2005 interacting with RJZ, and Morgan and John Zavoral entered

into a verbal agreement regarding Ed's Construction leasing RJZ equipment.

(Zavoral Decl. ¶ 39.)

Defendants further asserts there is evidence in the record demonstrating

that RJZ tried to assist Ed's Construction in performing its obligations under the

JVA.  For example, John Zavoral asserts that Ed's Construction was offered the

opportunity to produce, haul and place rip-rap to the project, but that Morgan

declined to do so because he did not have the proper equipment and because his

driver refused to work with persons from ICS.  (John Zavoral Decl. ¶ 18; Hart

Decl. Ex. 2 (John Zavoral Dep. at 104).)

Defendants further assert that Ed's Construction often did not show up to

the Heartsville Project, partly because he did not have the proper equipment, and

partly because Ed's Construction was working in Bemidji and he did not want to

travel to East Grand Forks to work for small amounts of work.  (Hart Decl. Ex. 2

(John Zavoral Dep. at 158-60, 219).)  Defendants further assert that weather, and

other changes to the Heartsville Project, prevented Ed' Construction from

performing more work.  (John Zavoral Decl. ¶ 19.)

Based on the above, the Court finds that there are genuine issues of fact as

to whether Defendants made certain false or fraudulent statements to conceal the

fact that the Section 8(a) requirements were not being met in order to cause the

Government to pay money to Defendants under the Contract.  The Court further

finds there are genuine issues of fact as to whether the Corps would have paid

the Joint Venture had it been known that the terms of the JVA with respect to the

Section 8(a) requirements were not being met.

### D.   Damages

The parties dispute the proper measure of damages in this case.

Defendants argue that to recover damages under the FCA, the Government must

prove damages under a benefit of the bargain standard.  See United States v.

Bornstein, 423 U.S. 303, 316 n. 13 (1976) (measuring the government's actual

damages as the difference in value between the product specified and the

product actually received.)   This standard applies regardless of the theory of

liability.  See, e.g., United States ex rel. Harrison v. Westinghouse Savannah

River, Co., 352 F.3d 908, 923 (4th Cir. 2003) (case involving claim of fraudulent

inducement); Science Applications Int'l Corp., 626 F.3d at 1279 (case involving

false certification claim).  Defendants argue that they are entitled to partial

summary judgment on the issue of damages under the FCA as the Government

conceded in its responses to contention interrogatories that it suffered no actual

damages as a result of the alleged violations of the FCA.  (See Hart Decl. Ex. 32

(Pl. Resp. Interrog. No. 21).)[2]  See also Ab-Tech Const., Inc. v. United States, 31

Fed. Cl. 429, 434 (1994) aff'd 57 F.3d 1084 (Fed. Cir. 1995) (in a case involving false

statements with regard to compliance with Section 8(a) requirements, court

denied government's claim to damages equal to three times the amount of

progress payments made because government did not prove it suffered any

detriment to its contract interest, and that it actually got what it paid for).

Defendants further argue that the Government has not submitted any

evidence to support a "worthless services" theory of recovery; that it received no

value from the flood control project at issue.  See United States ex rel. Mikes v.

Straus, 274 F.3d 687, 703 (2d Cir. 2001) ("In a worthless services claim, the

performance of the service is so deficient that for all practical purposes it is the

equivalent of no performance at all.")

One who violates the FCA "is liable to the United States for civil penalties

of not less than $5,000 and not more than $10,000, . . . plus 3 times the amount of

damages which the Government sustains because of the act of that person." 31

---

[2]The response reads "the government's damages in this case do not reflect 'economic damages' traditionally understood, but rather arise from harm to the competitive free enterprise economic system and overall economic policy goals for the Nation recognized by Congress in enacting the Small Business Act and the Small Business Economic Policy Act of 1980. . . "

U.S.C. § 3729(a).  The proper measure of damages in any case involving a

violation of the FCA is to "put[] the government in the same position as it would

have been if the defendant's claims had not been false."  Science Applications

Int'l Corp., 626 F.3d at 1278.  "Proper application of [the] benefit-of-the-bargain

measure depends on the particular circumstances of the case."  Id.  It may be that

the appropriate measure of damages is the difference in value between the

product specified and the product actually received, as applied in the Bornstein

decision, or it may be that the government is entitled to recover the full value of

payment made to the defendant if the government proves that it received no

value from the product delivered.  Id. at 1279.  Also, in cases in which the

defendant fraudulently sought payments for participating in programs designed

to benefit a third party, such as small minority businesses, courts have found that

the government can demonstrate that it received nothing of value, and that all

payments paid to the defendant are recoverable as damages.  Id.

For example, in United States v. Rogan, the Seventh Circuit explained that

when the government offers a subsidy with conditions, and when the conditions

are not satisfied, nothing is due, requiring that any amount paid based upon

fraud must be paid back. 517 F.3d 449, 453 (7th Cir. 2008).  See also United States

ex rel. v. CDW Gov't, Inc., No. 05-33, 2012 WL 2807040 (S.D. Ill. July 10, 2012)

(finding the correct measure of damages where a statutory precondition is not

met is the entire amount paid).  See also United States ex rel. Longhi v. Lithium

Power Techs., 575 F.3d 458, 473 (5th Cir. 2009) (finding that in cases where the

benefit to the government was to award money to eligible small businesses, and

such benefit was lost due to defendant's fraud, the government's damages may

equal the amount the government actually paid to the defendant); United States

v. TDC Mgmt. Corp., Inc., 288 F.3d 421, 428 (D.C. Cir. 2002) ("Once TDC deviated

from its contracted role as impartial ombudsman by seeking a financial stake in

joint ventures with private investors and by charging fees for the provision of

material assistance to minority entrepreneurs, the district court then could

properly find that the Program no longer had any value to the government.")  It

is the government's burden to prove that it received no value under the

applicable contract.  Science Applications Int'l Corp., 626 F.3d at 1279.

In this case, it is the Government position that the underlying purposes of

the Section 8(a) program is to "expeditiously ameliorate the conditions of socially

and economically disadvantaged groups . . . by providing the maximum

practicable opportunity for the development of small business concerns owned

by members of [these groups] . . . through the procurement by the United States of articles, equipment, supplies, services, materials and construction work from such concerns."  15 U.S.C. § 631(f)(1)(D-F).  Congress found that the United States would benefit by encouraging the expansion of suppliers, thereby enhancing competition and promoting economy in such procurements.  Based on these findings, Congress set forth the three-pronged purpose of Section 8(a), including to promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals, to allow them to compete on an equal basis; promote the competitive viability of such concerns; and to clarify and expand the program for the procurement by the United States of articles, supplies, services, materials, and construction work from such small business concerns.  15 U.S.C. § 631(f)(2)(A-C).

The Government asserts that Defendants deprived a disadvantaged business concern, Ed's Construction, and the economy as a whole, of the benefits of the Section 8(a) program.  The Joint Venture was chosen from among other qualified bidders who presumably intended to adhere to Section 8(a) requirements.  Had the Government known of Defendants' intention not to comply with Section 8(a), it would not have approved the JVA and awarded the

Contract to the Joint Venture and Defendants would not have earned anything from the Heartsville Project.

Based on these facts, where the benefit of the Section 8(a) program is to benefit small businesses controlled by socially and economically disadvantaged individuals, the Government is entitled to argue to the jury that it received no value under the Contract and that the proper measure of damages is the amounts paid to Defendants.  Defendants motion for summary judgment as to damages must be denied.

## VI.    FIRREA

Pursuant to FIRREA, whoever violates the Small Business Act, 15 U.S.C. § 645(a), may be liable for a civil penalty. 12 U.S.C. §§ 1833a(a), (c)(3).  Section 645(a) of the Small Business Act imposes liability on "[w]hoever makes any statement knowing it to be false . . . for the purpose of influencing in any way the action of the Administration, or for the purpose of obtaining money, property, or anything of value, under this chapter, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both."  The Government asserts that RJZ submitted multiple quarterly reports regarding the Contract and made a number of false statements and omissions so that the SBA

would not terminate the Contract.  The Government asserts that RJZ's knowing

misstatements to both the SBA and the Corps, and material omissions, influenced

the United States' actions and allowed RJZ to obtain something of value -

payments under the Contract.  Both parties move for summary judgment on this

claim.

The Government argues there is sufficient evidence supporting liability

under FIRREA.  For example, there is evidence that Craig Pietruszewski created a

sham leasing agreement so that it appeared that Ed's Construction had

performed work on the project, when it hadn't.  As the designated accountant for

the Joint Venture, Pietruszewski knew what he was doing when he asked Joe

Zavoral to provide employee and equipment hours for the month of January

2005, received data reflecting such usage in amounts that Ed's Construction

could not have possibly personally supervised, prepared invoicing to make it

appear those amounts were attributable to Ed's Construction, and reported them

as such to the SBA. (Fuller Decl. Ex. 29-30; 31; Boschee Decl. Ex. 7 (Pietruszewski

Dep. at 139, 141-43).)  Lethia Morgan testified that Peter Zavoral suggested the

sham leasing agreement, by which Ed's leased RJZ employee's and equipment.

(Boschee Decl. Ex. 10 (L. Morgan Dep. at 158).)  She also testified that she felt

pressured by RJZ to enter the sham leasing agreement, and that RJZ took advantage of the fact that Ed's was concerned about completing the work they were supposed to do and about getting paid.  (Id. at 90-91.)

The Government further asserts that Randy Czaia testified about a number of false statements and omissions during his deposition.  For example, Czaia testified that Pietruszewski did not tell him of his prior relationship with the Zavorals, or that Ed Morgan delegated the authority to sign Joint Venture checks to Pietruszewski, in violation of the JVA.  (Id. Ex. 5 (Czaia Dep. at 262-63, 281-82).)  He also testified that John Zavoral told him repeatedly that they intended to honor the JVA and that Ed's Construction would be performing their share of the work and that such assurances were false.  (Id. at 284-85.)

Because the Court finds that the facts underlying the Government's alleged false statements are disputed, summary judgment is not warranted.


**VII.   Common Law Claims of Unjust Enrichment, Payment by Mistake and Breach of Contract**

**A.     Unjust Enrichment**

Pursuant to the equitable theory of unjust enrichment, a person is unjustly

42

enriched if retention of a benefit would be unjust.  United States v. Rogan, 459 F.

Supp.2d 692, 721 (N.D. Ill. 2006) aff'd 517 F.3d 449 (7th Cir. 2008)[3].  To succeed on

this claim, the Government must prove three elements: "(1) a benefit was

conferred, (2) the recipient was aware that a benefit was received and; (3) under

the circumstances, it would be unjust to allow retention of the benefit without

requiring the recipient to pay for it." In re Pumehana Partners, No. 03-02804, 2005

WL 1176611 at *2 (Bankr. D. Hawaii, Jan. 10, 2005) (citing Corbin, Contracts § 561

(1963 and Supp. 1992).  To prove the third prong, the Government must show:

"(1) the plaintiff had a reasonable expectation of payment; (2) the defendant

should reasonably have expected to pay; or (3) society's reasonable expectations

of security of person and property would be defeated by nonpayment." Id.

(citing 1 Corbin, Contracts 19A (Supp. 1992)).

     The Government asserts that RJZ was unjustly enriched through the

Contract, as RJZ would not have received a single payment under the Contract

had the United States known that RJZ had no intention of complying with the

terms of the JVA, or that payments could have ceased had the United States

---

[3]Federal common law applies to a claim of unjust enrichment where the areas involved
are uniquely federal interests, such as a federal procurement contract.  See United States v.
Bame, 721 F.3d 1025, 1030 n.4 (8th Cir. 2013).  As this case involves a federal procurement
contract, federal common law applies to the Government's common law claims.

known the material provisions of the JVA were being violated by RJZ. For

example, the record contains evidence that RJZ made a total profit of $2,649,578,

whereas Ed's Construction made a total profit of $499,813. (Fuller Decl. Ex. 12 at

1, 15.) Pursuant to the JVA, however, Ed's Construction was to receive 51% of

the profits. As a consequence, the Government asserts that Defendant should be

made to return to the United States all monies it earned and has retained by

means of its wrongdoing.

Defendants argue the Government does not have standing to assert an

unjust enrichment claim, because the United States did not suffer an economic

loss as a result of Defendants' alleged false statements. The Government does

not claim, however, that it suffered an economic loss. Instead, the Government

asserts it has a government interest in promoting the purposes of the SBA, and

that Defendants' actions caused harm to such purposes. Accordingly, the Court

finds that the Government has standing to assert an unjust enrichment claim. For

the reasons stated above, however, fact questions preclude summary judgment

on this claim.

### B.    Payment By Mistake

The United States has the power, independent of any statute, to recover

monies its agents have wrongfully, erroneously or illegally paid out.  See United States v. Wurts, 303 U.S. 414, 416 (1938); United States v Lahey Clinic, Inc., 399 F.3d 1, 15 (1st Cir. 2005).   The Government may be entitled to recovery if it proves it made payments under the erroneous belief that the Joint Venture was complying with the terms of the JVA, which was material to the decision to pay. See United States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970).  Recovery may be appropriate even if payment was made due to the carelessness of a government official or if RJZ had no knowledge of the false statements.  See Mount Vernon Coop. Bank v. Gleason, 367 F.2d 289, 291 (1st Cir. 1966); Mead 426 F.2d at 125 n.6.

Because there are fact questions as to the Government's underlying claims of fraud and false statements, summary judgment on this claim is not warranted.

## C.    Breach of Contract

The Government argues that RJZ breached the Contract, or caused it to be breached, by submitting claims for payment when it did not perform work in accordance with the specifications of the Contract which was set aside for Section 8(a) concern.  (Doc. No. 19 (Amended Comp. ¶ 126).)

Defendants argue they are entitled to summary judgment on this claim as the payments under the Contract were not conditioned on compliance with the

terms of the JVA, which incorporated the requirements of Section 8(a).  In its

previous order denying Defendants' motion to dismiss, however, this Court

rejected the argument that the Joint Venture need not comply with Section 8(a)

requirements while performing work under the Contract "particularly in light of

the SBA's 8(a) reporting requirements which persisted through the completion of

the project."  (Doc. No. 20 (Order at 19).)

Defendants further argue that the Government's alternative breach of

contract claim is based on the "change in control" provision of the Contract,

which required the "Contractor" to notify the Corps and the SBA

> when the owner or owners of whom 8(a) is based plan to relinquish
> ownership or control of the concern.  Consistent with Section 407 of Pub. L.
> 100-656, transfer of ownership or control shall result in termination of the
> contract for convenience, unless the SBA waives the requirement for
> termination prior to the actual relinquishing of ownership and control.

(Hendricks Decl. Ex. A at 159 (Clause 252.219-7009(c) of the Contract).)

Defendants argue that "concern," as used in this Clause, refers to Ed's

Construction.  The Government, on the other hand, interprets "concern" as the

Joint Venture.  Defendants argue that the Government's interpretation is

unreasonable, because it fails to give meaning to other terms in the Clause, such

as ownership and control.  The Defendant argues that the JVA controls the Joint

46

Venture and provided that Ed's Construction had the authority to exercise control over the work performed on the contract by the Joint Venture.  Nothing in the JVA, however, suggests that Ed's Construction enjoyed ownership or control over the Joint Venture itself.

The Court finds that "concern" refers to the Joint Venture and that "owner or owners of whom 8(a) is based" refers to Ed's Construction.  This interpretation is consistent with the reference to Section 407 of Pub. L. 100-656, codified at 15 U.S.C. § 637(a)(21(A) in Clause 252.219-7009(c) which provides "Subject to the provisions of subparagraph (B), a contract (including options) awarded pursuant to this subsection shall be performed by the concern that initially received such contract. . . ."   The concern that received the Contract in this case is the Joint Venture.  Defendants have thus failed to demonstrate they are entitled to summary judgment on this alternative breach of contract claim.

**IT IS HEREBY ORDERED:**

1.      Defendants Motion for Summary Judgment [Doc. No. 111] is

DENIED; and

2.      Plaintiff United States of America's Motion for Partial Summary

Judgment [Doc. No. 114] is DENIED.

Date: October 21, 2014


s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court


Civil No. 12-668